[S. F. No. 19848. In Bank. Feb. 23, 1960.]

LEON N. LEBOIRE, Plaintiff, v. KEN F. ROYCE et al., Appellants; HYMAN-MICHAELS COMPANY (a Corporation), Respondent.

KEN ROYCE, INC. (a Corporation), Appellant, v. HYMAN-MICHAELS COMPANY (a Corporation), Respondent.

HYMAN-MICHAELS COMPANY (a Corporation), Respondent, v. KEN ROYCE, INC. (a Corporation), Appellant.

Freed & Freed, Eli Freed and Kurt W. Melchior for Appellants.

Philip S. Ehrlich, Irving Rovens and Fred Leuenberger for Respondent.

PETERS, J.—These three consolidated actions involve a controversy between joint venturers, Hyman-Michaels Company on the one side and Ken F. Royce and Ken Royce, Inc., on the other, over commissions paid by Royce to one Leon Leboire, and over attorney's fees paid by Royce in defending certain actions brought by Leboire against him. The basic contention of Royce is that these expenses were covered by the joint venture agreements executed by the parties.

The background facts are as follows: In 1947 Royce became interested in the purchase of war surplus construction machinery in the Pacific Ocean area. In order to make the proper connections and to secure introductions to the suppliers of such goods Royce entered into a written contract, on August 12, 1947, with Leboire by which he agreed to pay Leboire a 2½ per cent commission on the purchase price of equipment obtained through Leboire's connections. This contract also provided that "Any further purchases from above parties within one year from to date [sic] will be subject to a commission to you."

After making one purchase in his own name, Royce discovered that the transactions in contemplation would involve financial commitments beyond his means. For this reason he engaged in several joint venture agreements with Hyman-Michaels Company. The first such agreement was dated

August 22, 1947, and pertained to purchases from the General Commodities Corporation. The contract was actually executed several months after its date. Thereafter, several other joint venture agreements, all patterned on the basic contract dated August 22, 1947, were entered into between the parties. The basic provision of these agreements was that the contracting parties were to share profits, losses and expenses on a basis of 60 per cent for Hyman-Michaels and 40 per cent for Royce.

Before entering into the first joint venture agreement Royce purchased, as a result of Leboire's efforts, about $700,000 worth of equipment. The commission was paid on this transaction. Then the joint venture, well within the year stated in the Leboire contract, made several purchases of equipment in the Far East. Royce contended that the Leboire contract did not apply to purchases made by him as a joint venturer. Leboire sued Royce for some of these commissions. Hyman-Michaels was not a party to that lawsuit. Leboire, in that action, recovered a substantial judgment against Royce, which was affirmed on appeal (*Leboire* v. *Royce,* 100 Cal. App.2d 610 [224 P.2d 106]). In that case it was held that "Royce was nonetheless the purchaser of the goods even though Hyman-Michaels Company joined with him in the purchase." (P. 616.) This judgment was paid by Royce and the latter was reimbursed by Hyman-Michaels to the extent of slightly less than 60 per cent under an agreement which did not admit any liability to Royce or to Leboire.

Thereafter the three present actions were brought. These three actions were consolidated for trial and, insofar as they involve the rights of Royce and Hyman-Michaels, a single judgment was entered in favor of Hyman-Michaels. It is from this judgment in these actions that Royce now appeals.

The first of the three actions was brought by Leboire against Royce and his corporation for further claims for commissions on other purchases made by Royce, and his joint venturer Hyman-Michaels, within a year from August 12, 1947. In this action Royce filed a cross-complaint against Hyman-Michaels, seeking to hold that company liable for 60 per cent of any liability that might be imposed against Royce in favor of Leboire in the principal action. On the date of the trial of the main action of *Leboire* v. *Royce* the issues involved in that action were disposed of by the entry of a judgment on stipulation between Royce and Leboire for $45,000, plus

interest in the amount of $542.27. Hyman-Michaels Company was not a party to the stipulation or to the judgment. Royce paid the amount of this judgment to Leboire, and also paid the attorney's fees incurred by him in unsuccessfully defending the first Leboire action involved on the prior appeal.

The second action was one by Ken Royce, Inc., against Hyman-Michaels Company seeking to recover on the same claim contained in its cross-complaint in the first action, and also seeking to recover a contribution from Hyman-Michaels for the attorney's fees paid by Royce to defend on appeal the original action brought by Leboire.

The third action was brought by Hyman-Michaels against Ken Royce, Inc., for dissolution of a joint venture and for an accounting. This feature of this action was disposed of by stipulation. Ken Royce, Inc., filed a cross-complaint in this action raising all the matters that were at issue as a result of the first two actions.

The pleadings are lengthy and the reporter's transcript long, but the issues involved on appeal are but two in number. The first involves commissions paid to Leboire as a result of his second action against Royce and the attorney's fees paid by Royce in defending that action. As to this issue, it is the theory of Royce that, under the terms of the joint venture contracts with Hyman-Michaels, the latter is required to reimburse Royce for 60 per cent of all expenditures made by Royce to carry out the objects of the joint venture; that Royce so expended $47,542.27 for commissions and attorney's fees; that, therefore, Hyman-Michaels is required to reimburse Royce for such expenditures to the extent of 60 per cent as provided in the joint venture contracts.

The second issue involves a claim by Royce that Hyman-Michaels, under a contract with him dated March 22, 1949, which was while the appeal in *Leboire* v. *Royce,* 100 Cal. App.2d 610 [224 P.2d 106], was pending, is liable to him for 60 per cent of the $2500 attorney's fees he paid to defend that action on appeal.

Hyman-Michaels contends that it is not liable for any of these charges, and the trial court so found. Royce appeals, contending that the trial court has misinterpreted the contracts between the parties.

The commissions here involved are those claimed by Leboire in respect to purchases of equipment made by the joint venture from the Mariannas Trading Company during the year fol-

lowing August 12, 1947,[1] and in respect to purchases made by Hyman-Michaels from the Central Bank of China under a contract dated March 1, 1948, in which transactions Royce, on April 14, 1948, became a joint venturer with Hyman-Michaels upon the terms set forth in their joint venture agreement dated August 22, 1947. This agreement was superseded by a joint venture agreement between Royce and Hyman-Michaels dated December 10, 1948.[2]

Royce's claim that his obligations to Leboire became an obligation under the joint venture contracts depends basically upon the proper interpretation to be given to two paragraphs, both numbered 8, appearing in the two main joint venture contracts here involved.

In paragraph 8 of the basic joint venture agreement dated August 22, 1947, the parties described the various services they were to furnish to the joint venture and declared that "actual out-of-pocket expenses incurred by either party hereto for the joint venture shall be repaid to it by the joint venture as hereinbelow provided." Then the agreement describes some of such expenses, such as employees' salaries where such employees devote their full time to the joint venture, and commissions paid to salesmen of either party in connection with the sale of tractors covered by the agreement. Then it is again provided that: "All actual out-of-pocket expenses of either party hereto, incurred in connection with the business and affairs of the joint venture, shall be deemed and treated to be a joint venture expense," and that "Such expenses shall include, but are not limited to, travel fare, hotel charges, meal expenses and other incidentals incurred while travelling for and on behalf of the joint venture." Then the paragraph concludes with these key provisions: "All expenses incurred by either party prior to the execution of this agreement in and about the procuring of the said contract with General Commodities Corporation, Ltd., . . . are hereby

---

[1]It will be remembered that the contract between Royce and Leboire of August 12, 1947, provided that Royce agreed to pay Leboire a 2½ per cent commission on all purchases of equipment obtained through Leboire's connections, and also provided: "Any further purchases from above parties within one year from to date [sic] will be subject to a commission to you [Leboire]." Hyman-Michaels was not a party to this contract, nor was it a party to the original action brought by Leboire against Royce. It is not bound by that contract nor by the judgment rendered in that action.

[2]The judgment involved in Leboire v. Royce, 100 Cal.App.2d 610 [224 P.2d 106], was for commissions payable to Leboire on purchases made from General Commodities Corporation, Ltd., pursuant to contracts dated August 22, 1947, and October 23, 1947.

assumed by the joint venture, and shall be repaid to the First Party [Hyman-Michaels] in mode and manner as hereinbelow provided. In this connection it is understood and agreed that one-half (½) of the actual expenses of David W. Evans and John Langan in connection with their trips to Okinawa and/or Guam for the purpose of inspecting the tractors which are the subject matter of this contract shall be borne by the joint venture and the joint venture shall reimburse the Second Party [Royce] for one-half (½) of said expenses.''

This contract also provided very carefully for a division of losses or profits of the joint venture in paragraph 4 by providing that Hyman-Michaels should first be fully reimbursed ''for all cash advanced or contributed by it as capital to the joint venture and for other obligations incurred in connection therewith'' and that after Hyman-Michaels was so reimbursed the remaining assets of the joint venture shall be owned 60 per cent by Hyman-Michaels and 40 per cent by Royce. This paragraph concludes as follows:

''The profits or losses resulting from the operation of the joint venture shall be divided or borne between the parties in the following proportions: 60% to or by the First Party [Hyman-Michaels] and 40% to or by the Second Party [Royce].''

The other basic provision involved is contained in Paragraph 8 of the joint venture agreement of December 10, 1948. This paragraph is substantially similar to Paragraph 8 in the agreement dated August 22, 1947, above quoted, except that it omits reference to the expenses of Evans and Langan and recasts the next to the last sentence to read: ''All expenses incurred by either party prior to the execution of this agreement in and about the procuring of said equipment are hereby assumed by the joint venture, and shall be repaid to the first party [Hyman-Michaels] in mode and manner as hereinbelow provided.''

It is Royce's contention that the commissions paid by Royce to Leboire on purchases made by the joint venture are subject to contribution and reimbursement under these provisions. It is urged that the contract is clear and unambiguous in this respect and that it was error to admit parol evidence on the issue.

A reading of the two contract provisions that are involved demonstrates that either they clearly provide that Hyman-Michaels is not to be liable for the commissions and fees here in issue, or at least the contracts are ambiguous in this respect.

It must be remembered that the contracts dated August 22, 1947, and December 10, 1948, were not agreements whereby the joint venture was to take over contracts that had been already negotiated by Royce, but to take over contracts that Hyman-Michaels had negotiated with third parties. The commissions under discussion that Royce paid to Leboire were not incurred by Royce in securing those contracts, but became payable only because of the contract between Royce and Leboire whereby Royce agreed to pay Leboire commissions on all purchases made by Royce during the year specified. They were not expenses of the joint venture. Apparently the only "prior" expenses of Royce that the parties had in mind were the travel expenses of Evans and Langan. Equally apparent is the fact that the parties must have believed that Hyman-Michaels incurred, or may have incurred, various expenses of a varied nature in securing the contracts. Thus it is not only a possible but a reasonable interpretation that the parties intended that Royce should be reimbursed only as to the Evans and Langan expenses, and Hyman-Michaels should be reimbursed for all of its expenses incurred in negotiating the contracts.

This interpretation gives meaning to the particular language here under interpretation. The basic provision upon which Royce relies is the provision that is contained in the August 22, 1947, agreement: "All expenses incurred by either party prior to the execution of this agreement in and about the procuring of said contract . . . are hereby assumed by the joint venture, and shall be repaid to" Hyman-Michaels, but the Evans and Langan expenses shall be repaid to Royce. In the December 10, 1948, agreement the Evans-Langan expenses are omitted and it is simply provided that: "All expenses incurred by either party prior to the execution of this agreement in and about the procuring of said equipment are hereby assumed by the joint venture, and shall be repaid to" Hyman-Michaels. No specific reference is made to any expenses of Royce. Quite clearly the parties had in mind the reimbursement of Hyman-Michaels and not of Royce, except as to the Evans-Langan expenses.

To say the least, the contracts are ambiguous. While the words "All expenses incurred" could conceivably include the commissions here involved, such an interpretation ignores the limiting words "shall be repaid to" Hyman-Michaels, and the specific reference to the Evans-Langan expenses incurred by Royce. Under such circumstances extrinsic evidence was

admissible. (*Beneficial etc. Ins. Co.* v. *Kurt Hitke & Co.,* 46 Cal.2d 517, 523 [297 P.2d 428] ; *Schmidt* v. *Macco Construction Co.,* 119 Cal.App.2d 717, 731 [260 P.2d 230] ; *MacIntyre* v. *Angel,* 109 Cal.App.2d 425, 429 [240 P.2d 1047].)

The trial court properly admitted and considered extrinsic evidence to assist it in interpreting the challenged clauses. This evidence was not only admissible, but supports the findings. That evidence was to the effect that although the first joint venture agreement is dated August 22, 1947, it was not finally drafted and signed until about October 17, 1947. Beween these two dates there were many conferences between the parties and their counsel, and many revisions of the agreement. At no time during this period did Royce, or his attorney, mention Leboire or the Leboire contract to Hyman-Michaels or to its attorney. No one connected with Hyman-Michaels ever heard of Leboire or the Leboire contract until long after the contract was signed. The evidence also shows that until after November 6, 1947, when the first Leboire action was filed, it never even occurred to Royce that he might be liable to Leboire for purchases made by Royce through the joint venture.

Of course, when the other joint venture contract was signed on December 10, 1948, the claims of Leboire were known because he had secured a judgment in the first action in June of 1948. Nevertheless, Royce agreed to a contract providing that: "All expenses incurred by either party prior to the execution of this agreement . . . shall be repaid" to Hyman-Michaels. Royce did not then seek or secure a change in verbiage. It is certainly reasonable to infer that the words used in December, 1948, were intended to mean what they meant in 1947, and in 1947, as already pointed out, no one believed that they included Leboire's demands.

It should also be pointed out that the record shows that all of the expenses of Evans and Langan in connection with the General Commodities contract were incurred before October 13, 1947, when they returned from their trip. Since the agreement dated August 22, 1947, was not executed until October 17, 1947, it is apparent that such expenses were incurred prior to the execution of that agreement. For this reason, the provision for the reimbursement to Royce of those expenses was inserted in paragraph 8 of that agreement. The parties then thought that specific coverage of that item was necessary although that expense was directly connected with

the joint venture there involved. It is reasonable to believe that the parties did not intend that the "all expenses" provision covered this item. Certainly if the parties did not intend that the "all expenses" clause should cover Evans' and Langan's expenses and required a separate clause for that purpose, they never could have intended that the "all expenses" clause should cover a purely personal expense of Royce, such as his contractual obligation to Leboire. Thus the provisions of the contract itself and the extrinsic evidence offered to interpret it are consistent. The trial court correctly interpreted the agreements.

▄▄▄ The contention of Royce that he is entitled in quasi contract to recover a share of these commissions from Hyman-Michaels because the latter received benefits from the services of Leboire is without merit. The trial court found that the purchases here involved were not made from any of the persons mentioned in the Royce-Leboire contract, and that all of the purchases here involved were attributable to persons other than Leboire. Although the evidence and the reasonable inferences therefrom on this issue may be conflicting, there is ample evidence to support the finding. There is evidence that the purchases were made through or from the Mariannas Trading Company and the Bank of China, and not through or from Tom Davis or General Commodities Corporation, Ltd., mentioned in the Royce-Leboire contract. There is direct evidence, and the trial court found, that the Bank of China contract was attributable to one F. T. Li who had long been known to Hyman-Michaels and who negotiated directly with Hyman-Michaels as the representative of the Bank of China. Thus, under these supported findings, there is no basis of any theory that Hyman-Michaels received and accepted any benefits arising out of the Royce-Leboire contract.

▄▄▄ For somewhat similar reasons there is no merit in Royce's contention that section 15018, subdivision (b), of the Corporations Code[3] requires contribution from Hyman-Michaels. The contention is that the commissions paid to Leboire constituted expenditures by Royce incurred "for the preservation" of the joint venture's "business or property."

---

[3]Section 15018 of the Corporations Code contains some of the statutory rules determining the rights and duties of partners. Subdivision (b) of the section provides:

"The partnership must indemnify every partner in respect of payments made and personal liabilities reasonably incurred by him in the ordinary and proper conduct of its business, or for the preservation of its business or property."

It is urged that the evidence shows that by reason of these payments to Leboire, that broker was prevented, for the period of one year, from soliciting competitors for the purchase of the equipment involved. It is contended that the ultimate seller was the Chinese government. Thus, so it is urged, the payments to Leboire were incurred by Royce for the "preservation" of the joint venturers' property. There is evidence to that effect. But, as pointed out in the discussion, *supra,* of the point involving quasi contract, the trial court found, and the findings are supported, that all of the purchases here involved were attributable to persons other than Leboire, and that none of the purchases was made from persons or companies mentioned in the Royce-Leboire contract. From these findings it is a reasonable inference that the joint venture not only received no benefits from the payments to Leboire, but that such payments were not incurred in the "preservation" of the joint venturers' "business or property." The trial court was justified in concluding, inferentially, that the benefit, if any, of keeping Leboire from introducing other buyers to his contacts, was too remote to fall within the meaning and purpose of section 15018, subdivision (b).

Other contentions made by Royce on this phase of the appeal as to these commissions are without merit, and do not warrant comment. The claim for reimbursement for a portion of the attorney's fees expended by Royce in the second Leboire action is governed by the same facts and rules of law applicable to the commissions. For the reasons stated as to the commissions, the claim for such fees was properly denied.

The other major point involved on this appeal relates to the attorney's fees Royce paid his attorney for the handling of Royce's appeal in the first action brought by Leboire against Royce. After Leboire had secured that judgment, Royce informed Hyman-Michaels of the amount of such judgment. Royce contended that Hyman-Michaels was liable for 60 per cent of the judgment. Hyman-Michaels was contending that it was not liable at all. In order to settle this dispute the parties entered into an agreement on March 22, 1949, while the appeal was pending. That agreement is evidenced by a letter from Hyman-Michaels to Royce of that date. It refers to the judgment and stated: "Based upon the terms and conditions herein set forth, and not otherwise, we are prepared to assume liability to the extent as hereinafter set forth." The "terms and conditions" set forth are nine

in number and are set forth in full in the footnote.[4] Admittedly Royce paid his attorney $2,500 for legal services rendered upon the appeal in the first Leboire action.

It is Royce's contention that under paragraph 9 of that letter he is entitled to reimbursement of 60 per cent of this fee paid by him. It will be noted that under paragraph 8 it was required that the attorney for Hyman-Michaels be consulted as to all matters involved on the appeal, and, under

"'1. This letter and the contents thereof shall not in any way constitute a contract for the benefit of a third person, and no liability to the plaintiff in the action above referred to is admitted by virtue of the execution hereof.

''2. This letter shall not be construed as an admission of any liability to you and/or Leboire and/or any third person, and our assumption of liability hereunder upon the terms and conditions herein set forth is based exclusively upon considerations to us and not arising out of any legal liability to you or to the plaintiff or to any third person. We are assuming the liability hereinafter set forth, although advised by our counsel Philip S. Ehrlich that we owe no legal liability to you and/or Leboire and/or any third person arising out of the judgment hereinabove referred to, or any other relationship existing between you and/or Leboire and/or ourselves, or arising out of any other controversies in which you or Leboire may be involved.

''3. Our assumption of liability hereunder is not and shall not be construed as a precedent or in any manner requiring us to assume any liability hereafter in any other controversies between you and Leboire, and our action hereunder is not indicative of our future course of conduct in any other controversy in which you and Leboire may be involved.

''4. Our action hereunder shall not be nor shall it be construed as in any way affecting our legal position or status in this matter, or in any other controversies that may arise between you and/or Leboire and/or ourselves.

''5. This letter shall be inadmissible in any court of law or equity in which you and the undersigned are involved, except in the event of litigation between you and the undersigned based upon this memorandum to enforce performance thereof.

''6. In the event the judgment above referred to is reduced to not to exceed 40% of its face amount, we will consider it as a proper item of expense of the joint venture and it will be shared proportionately 60% by us and 40% by you as other expenses of the joint venture.

''7. In the event the judgment is sustained in the full amount, or in any amount in excess of 40% of its face amount, the excess over 40% will be borne by you and the undersigned equally, that is to say, it will be apportioned 50% to you and 50% to us and shared accordingly as part of the expenses of the joint venture.

''8. Philip S. Ehrlich, our counsel, shall be consulted in connection with all matters involved in the pending litigation, and no settlement binding upon us shall be effectuated without our written consent and approval.

''9. We shall likewise assume our share of attorney's fees and costs conditioned upon the same ratios upon which we are assuming the judgment, and provided further that no attorney's fees shall be agreed upon or be binding upon us until they have received our written approval and consent.''

paragraph 9 "no attorney's fees shall be agreed upon or be binding upon us until they have received our written approval and consent."

The trial court made no finding as to whether the amount of the fee was or was not reasonable. It simply found that on March 22, 1949, the parties entered into the assumption of liability agreement; that Royce in the defense of the appeal incurred and paid $2,500 to the attorneys; that Royce demanded that Hyman-Michaels pay 60 per cent of such fee; that Hyman-Michaels refused, and that it is not true "that Hyman-Michaels Company has arbitrarily refused to approve the amount of said attorney's fee." The court then quoted paragraph 9 of the agreement of March 22, 1949, and then found that the attorney's fee involved was incurred by Royce "without the written approval and consent of Hyman-Michaels Company and without the written approval or consent of Hyman-Michaels Company." Based on these findings, the trial court concluded that Royce had not shown a right to reimbursement to any portion of the fee.

Royce testified that he was charged $2,500 for the legal services involved; that he paid that sum to his attorney; that such fees were reasonable; that he demanded proportional reimbursement from Hyman-Michaels; that Hyman-Michaels refused to pay its share of the fees or any portion thereof. The attorney for Hyman-Michaels testified that during the course of the appeal the attorney for Royce furnished him with a complete transcript of the trial proceedings and consulted with him about the appeal and about the briefs. The attorney for Hyman-Michaels did not contend, urge, or testify that such consultations were not such as were contemplated by the contract.

It is quite apparent that paragraphs 8 and 9 complement each other and must be read together. The two paragraphs had a dual purpose. The main purpose of the approval requirement in paragraph 8 was to assure Hyman-Michaels that it would be consulted on the tactics and arguments to be advanced on appeal. The purpose of paragraph 9 was to assure Hyman-Michaels that it would have a voice in fixing the fee.

The first purpose was accomplished—Hyman-Michaels was consulted during the appeal. This was the main purpose of the provisions. But Hyman-Michaels was not consulted about nor did it approve the fee. This fact should not operate to relieve Hyman-Michaels from all liability. Obviously, Hyman-Michaels and Royce were not contracting to the effect that

Hyman-Michaels could refuse its consent or give its approval at its mere personal whim or caprice. Rather, this was a business transaction. We must assume that both sides intended to be fair, and that neither intended that payment should be left to the whim or caprice of either party. So interpreted, paragraph 9 must be interpreted to mean that Hyman-Michaels agreed to pay a reasonable fee, and that it was to be consulted in fixing that fee. But the approval and consent provision was only incidental to the basic obligation to pay a reasonable fee.

The "written approval and consent" provision did not import a standard of personal satisfaction. It required that a refusal to give such approval or consent should be in good faith.

■ The situation is simply one where one party contracts to perform to the "satisfaction" or "subject to the approval" of the other party. Although "satisfaction" and "approval" are made conditions precedent to recovery, and although conditions precedent must ordinarily be performed before liability attaches, that rule does not operate to make such "satisfaction" or "approval" rest solely in the discretion of the other party to the contract. Such provisions are generally construed as meaning reasonable "satisfaction" or "approval." This is the general law (see cases collected 12 Am. Jur. § 341, p. 897; 3 Corbin, Contracts, § 645, pp. 568-569, n. 70; see also language of Holmes, J., in *Hawkins* v. *Graham*, 149 Mass. 284 [21 N.E. 312, 14 Am.St.Rep. 422]) and certainly is the law in California. ■ In *Collins* v. *Vickter Manor, Inc.*, 47 Cal.2d 875, 882 [306 P.2d 783], the rule is stated as follows: "A contractual provision for performance to the satisfaction of one of the parties ordinarily calls for such performance as would be satisfactory to a reasonable person. (*Thomas Haverty Co.* v. *Jones* (1921), 185 Cal. 285, 296 [7] [197 P. 105].) . . . If acceptance or rejection . . . were dependent on the buyer's uncontrolled caprice, then he would be the sole judge of his own satisfaction and could withdraw from the contract without regard to the reasonableness of his decision. (*Tiffany* v. *Pacific Sewer Pipe Co.* (1919), 180 Cal. 700, 702-704 [182 P. 428, 6 A.L.R. 1493] . . .) ■ But where the question is whether an agreed performance will satisfy a requirement of commercial value or quality, operative fitness or mechanical ability, the party to whom such performance is tendered is not justified in claiming arbitrarily, unreasonably or capriciously that he is not satisfied, in order

to evade liability. (*Thomas Haverty Co.* v. *Jones* (1921), *supra,* 185 Cal. 285, 296 [7]; *Tiffany* v. *Pacific Sewer Pipe Co.* (1919), *supra,* 180 Cal. 700, 702-704 [1]; *Melton* v. *Story* (1931), 113 Cal.App. 609, 613 [298 P. 1032].)''

 Certainly, the attorney's fee here involved had a ''commercial value or quality.'' The amount of a reasonable fee is capable of ascertainment. Admittedly the services were rendered and paid for. Admittedly, Hyman-Michaels agreed to pay 60 per cent of the attorney's fee, subject only to its ''approval and consent.''

Under such circumstances the rule above referred to is clearly applicable. The contract must be construed to mean that Hyman-Michaels agreed to pay its proportion of a reasonable fee, and the ''consent'' provision of paragraph 9 meant a reasonable consent. While it is true that the court here found that Hyman-Michaels did not ''arbitrarily refuse'' to approve the fee, a reading of the findings as a whole demonstrates that that finding is predicated on the finding that Hyman-Michaels was not to be liable unless its written ''approval and consent'' were first secured. As already pointed out, that is not the law.

Hyman-Michaels cannot be held liable for its proportion of the $2,500 fee, because, as already pointed out, its agreement was to pay a proportion of a reasonable fee. There is no finding that the $2,500 was such a fee. This portion of the judgment must be reversed so that the trial court can determine what is a reasonable fee, nor to exceed the $2,500 actually paid.

The judgment, insofar as it denied Royce any recovery for a portion of the attorney's fee paid by him on the appeal of the first action, is reversed, with instructions to the trial court to determine what is a reasonable fee not to exceed $2,500, and to enter judgment for Royce for 60 per cent of that fee. In all other respects the judgment is affirmed. Each side to bear its own costs on this appeal.

Gibson, C. J., Traynor, J., Schauer, J., Spence, J., McComb, J., and White, J., concurred.